# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JAMES SEDRICK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 07 C 5811 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| ALL PRO LOGISTICS, LLC, and RONALD L. | ) | |
| LEEK, | ) | |
| | ) | |
| Defendants. | | |

## <u>MEMORANDUM OPINION & ORDER</u>

Plaintiff James Sedrick has sued Defendants All Pro Logistics, LLC, and Ronald L. Leek (collectively "APL"), alleging that APL failed to pay Sedrick time and a half for overtime hours worked, as required by the Fair Labor Standards Act ("FLSA"). Sedrick had previously intended for this to be a representative action, but now seeks to pursue relief only on his own behalf. Sedrick has also raised state law claims regarding the lack of overtime pay, but the parties agree these claims will rise or fall with Sedrick's FLSA claim, and the merits of these claims will not otherwise be addressed. There are no material facts in dispute between the parties. The only question is whether APL is exempted from being required to pay overtime under the FLSA because of the Motor Carrier Act ("MCA") exemption. Both parties have moved for summary judgment on the issue of liability, which is resolved here.

## I. FACTS

APL provided transportation services to Bay Valley Foods ("BVF"). BVF produced a coffee creamer ("the product") which APL transported for BVF. BVF produced the product at a facility in Pecatonica, Illinois. After being manufactured and placed into packaging, the product was assigned to particular customers, and a label was placed on the product to indicate the intended

customer. The product was then transported to BVF's warehouse facility in South Beloit, Illinois, one of several warehouse facilities BVF has throughout the country.[1]

The product was allocated to customers pursuant to quarterly "forecasts" given to BVF by the customers, reflecting the customer's likely future demand. However, because many BVF customers were large companies with multiple stores—some outside of Illinois and some within Illinois—the specific geographic destination of the product was unknown at the time it was packaged at the Pecatonica facility.[2] The specific quantity a customer would actually receive was not known; a customer's product allocation remained at the South Beloit facility until the customer contacted BVF and requested that part of its allocation be sent to a particular store, or stores, of the customer. Allocations of the product could remain at the South Beloit warehouse for as little as a day before being sent on to a customer, or as long as a year, after which time the product was recalled and would not be shipped to customers. Depending on the need of the customers, the product would sometimes be delivered within Illinois, and would sometimes be delivered outside of Illinois.

Sedrick was employed by APL as a local carrier truck driver. He worked as a "spot driver," delivering packaging material produced in Rockwell, Illinois to BVF's facility in Pecatonica, and also delivering the product from Pecatonica to the warehouse in South Beloit. Sedrick did not engage in any interstate travel; his work was strictly intrastate. Sedrick did not deliver any of the

---

[1] At least some product was also placed into larger storage containers that were not intended for consumers, but which were also transported to South Beloit for storage, after which the containers would return to Pecatonica to complete the packaging process.

[2] APL claims to object to this fact, arguing that since the customer name is known, the geographic location is known as well. This argument is not supported by the record. First, it is agreed that many customers have multiple locations. Second, it is agreed that at least some of the product is never delivered to customers as it expires before delivery. On this record, it is not established that knowing the customer is equivalent to knowing the final destination of the product.

product to BVF's customers, though other APL drivers would provide this service to BVF, and would engage in interstate travel during at least some of the deliveries.

## II. ANALYSIS

Summary judgment is warranted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Brengettcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005). All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008). Although this is a cross-motion for summary judgment, the arguments presented by each party in its brief for summary judgment are identical to those raised in its brief against the other's summary judgment motion, and thus both motions will be considered together.

The legal question this action presents is narrow, though several statutes are relevant. This case involves the question of whether an FLSA exemption obviates Sedrick's claim to overtime wages. FLSA exemptions are to be narrowly construed, and the party claiming the exemption has the burden of showing its entitlement to the exemption. *Bankston v. Illinois*, 60 F.3d 1249, 1252 (7th Cir. 1995).

Section 207 of the FLSA requires employers to pay employees time and a half for any work performed beyond forty hours in a given week. 29 U.S.C. § 207(a)(1).[3] There are exceptions to this

---

[3] "Employees engaged in interstate commerce; additional applicability to employees pursuant to subsequent amendatory provisions[.] (1) Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C.

3

rule, contained within section 213. One exception originates from the MCA, and provides that the provisions of section 207 do not apply to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." § 213(b)(1).

Section 31502 of Title 49 relates to the regulation of certain commercial motor vehicles, and permits the Secretary of Transportation to regulate various aspects of the business of commercial motor vehicles, including the maximum hours a driver may work, the qualifications of drivers, and the safety of the equipment. 49 U.S.C. § 31502(b). These provisions apply to, *inter alia*, "motor private carriers," as that term is defined in section 13102 of Title 49. § 31501. The parties agree that the MCA applies to Sedrick only if he is found to qualify as a motor private carrier.

Section 13102 defines "motor private carrier" as follows:

The term "motor private carrier" means a person, other than a motor carrier, transporting property by motor vehicle when—
(A) the transportation is as provided in section 13501 of this title;
(B) the person is the owner, lessee, or bailee of the property being transported; and
(C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise.

49 U.S.C. § 13102(15). Sedrick concedes that parts (B) and (C) are satisfied; Sedrick was the bailee of the property being transported, and the property was being transported to further a commercial enterprise. But the definition is written in the conjunctive, and Sedrick argues that the first requirement, that the transportation in question meets the definition of section 13501, is lacking.

The interpretation of section 13501 forms the controversy in this case. Section 13501 addresses the Secretary of Transportation's jurisdiction, and provides as follows:

---

§ 207(a)(1).

4

The Secretary and the Board have jurisdiction, as specified in this part, over transportation by motor carrier and the procurement of that transportation, to the extent that passengers, property, or both, are transported by motor carrier—

    (1) between a place in—

        (A) a State and a place in another State;

        (B) a State and another place in the same State through another State;

        (C) the United States and a place in a territory or possession of the United States to the extent the transportation is in the United States;

        (D) the United States and another place in the United States through a foreign country to the extent the transportation is in the United States; or

        (E) the United States and a place in a foreign country to the extent the transportation is in the United States; and

    (2) in a reservation under the exclusive jurisdiction of the United States or on a public highway.

49 U.S.C. § 13501. Parts (a)(1)(A) and (B) make clear that the Secretary of Transportation's authority applies generally to *interstate* commerce. However, courts have avoided a rigid interpretation of section 13501, and the fact that a driver has or has not crossed a state line is not dispositive. So long as the goods are being transported on an interstate journey, all legs of that journey satisfy Section 13501's requirement, even if one or several of the legs are strictly intrastate. The Supreme Court explained this "practical continuity of movement" approach in *Walling v. Jacksonville Paper Co.*, 317 U.S. 564 (1943), where goods were first transported by a carrier within one state to a warehouse, and were then transported by other carriers to interstate locations:

The entry of the goods into the [in-state] warehouse interrupts but does not necessarily terminate their interstate journey. A temporary pause in their transit does not mean that they are no longer 'in commerce' within the meaning of the Act. As in the case of an agency . . . if the halt in the movement of the goods is a convenient intermediate step in the process of getting them to their final destinations, they remain 'in commerce' until they reach those points. Then there is a practical continuity of movement of the goods until they reach the customers for whom they are intended.

*Id.* at 568. Section 13501 would therefore apply if a carrier transports a product intrastate to a warehouse, so long as the product is intended to continue on an interstate journey.

With this interpretation in mind, a court must inquire into when the intent to send the product into interstate commerce was formed. Intent "is determined by reference to the intended final destination of the shipment as that intent existed when the shipment commenced." *Project Hope v. M/V IBN SINA*, 250 F.3d 67, 74 (2d Cir. 2001); *Foxworthy v. Hiland Dairy Co.*, 997 F.2d 670, 672 (10th Cir. 1993) ("Crucial to a determination of the essential character of a shipment is the shipper's fixed and persisting intent at the time of shipment.") (quoting *Int'l. Bd. of Teamsters, Chauffeurs, Warehousemen & Helpers v. Interstate Commerce Comm'n*, 921 F.2d 904, 908 (9th Cir. 1990)). The original intention "fixes the character of the shipment for all the legs of the transport within the United States. . . . Thus, if the final intended destination at the time the shipment begins is another state, the [MCA] applies throughout the shipment, even as to a carrier that is only responsible for an intrastate leg of the shipment." *Project Hope*, 250 F.3d at 74.

Regulations for determining a shipper's "fixed and persisting intent" have been codified at 29 C.F.R. § 782.7. There is no fixed and persisting intent to ship goods in interstate commerce where:

> (i) At the time of shipment there is no specific order being filled for a specific quantity of a given product to be moved through to a specific destination beyond the terminal storage, and (ii) the terminal storage is a distribution point or local marketing facility from which specific amounts of the product are sold or allocated, and (iii) transportation in the furtherance of this distribution within the single State is specifically arranged only after sale or allocation from storage.

29 C.F.R. § 782.7(b)(2); *Foxworthy*, 997 F.2d at 672–73. APL argues that this test is inapplicable because it is derived from a ruling by the ICC involving the movement of a product first from one state to another by means of rail, pipeline, motor, or water (which clearly involves interstate travel), and then by an intrastate driver to a storage location. § 782.7(b)(2). This observation is correct, but is not material. The focus of the inquiry in section 782.7(b)(2) has nothing to do with the fact that the product had previously crossed state lines and is now being moved intrastate by a separate

carrier; the focus is on whether the product has an intended final destination. If this were not evident enough from the regulation itself, it is made clear by the fact that the existence of an intended final destination is dispositive on this issue. For example, when a product with a fixed final destination is moved across state lines to a hub, and is then transported intrastate to its final destination, every leg of this journey is covered by the MCA, including the last leg which is strictly intrastate. See *Foxworthy*, 997 F.2d 670 (finding that driver in Oklahoma is exempted since product was first moved into Oklahoma from Arkansas). Section 782.7(b)(2) was written to guide determination of a shipper's intent, which is the issue in this case. APL offers no alternative mechanism for determining the shipper's intent. The court finds that although section 782.7(b)(2) may have been written for a slightly different context, it is apposite. The regulation is "entitled to great weight" since it has been agreed to by both the Department of Labor (in charge of interpreting the FLSA) and the Interstate Commerce Commission ("ICC").[4] *Baird v. Wagoner Transp. Co.*, 425 F.2d 407, 411 (6th Cir. 1970).

Applying section 782.7(b)(2) to this case, there was no fixed and persisting intent to move the product interstate at the time Sedrick transported it from Pecatonica to South Beloit. The product transported by Sedrick was assigned to particular customers, but that allocation were based on quarterly forecasts; it was not based on a specific order for a specific quantity to be moved to a specific destination beyond the South Beloit warehouse. § 782.7(b)(2)(i). The South Beloit facility served as a distribution point or local marketing facility from which specific amounts of the product were sold or allocated; the product was held in South Beloit until a customer contacted BVF and requested a specific quantity to be sent to a specific location, at which time BVF either permitted

---

[4] The Interstate Commerce Commission has been replaced by the Surface Transportation Board. *See* ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803.

the customer to pick the product up itself, or arranged for the product to be shipped to the customer's final destination. § 782.7(b)(2)(ii). Finally, transportation of the product from beyond the South Beloit warehouse was not arranged until after the product had arrived at South Beloit. The product remained in the warehouse from as little as one day to as long as a year before shipping arrangements were made. § 782.7(b)(2)(iii). Any product that remained over one year was recycled by BVF.

The Sixth Circuit in *Baird v. Wagoner Transportation Co.*, 425 F.2d 407 (6th Cir. 1970) reached the same conclusion based on similar facts. There, petroleum product was moved to a storage facility based on forecasts for particular customers, but was not delivered until a subsequent time when an actual order was made. *Id.* at 411–12. In that case, the record showed that the final location of the product was known, but the specific quantity to be delivered was unknown until after it arrived at the storage facility, as the original shipments were based on forecasts. *Id.* The court concluded from this that there was not a fixed and persistent intent to ship goods in interstate commerce. *Id.* In the case at bar, neither the quantity nor the destination is known. The quantity is unknown because, as in *Wagoner Transportation Co.*, BVF's production is based on forecasts, but the actual amount delivered may vary and at least some of the product will be recycled by BVF because it will remain at the South Beloit facility for over one year. Second, though the product is allocated by customer, it is not allocated to any customer's specific destination, and many customers have several destinations where the product can be delivered.

APL raises several issues that it contends mandate the opposite conclusion. First, APL argues that a final destination for the product was always known since it was designated for a particular customer. As noted already, the court cannot accept this argument as proof of the product's destination because at least some customers have multiple destinations. APL insists that

the *geographic* destination (*i.e.*, which of the customer's many facilities) is immaterial, but this argument overlooks the requirements of section 13501 of title 49 of the U.S. Code, which expressly focuses on whether the product is intended to cross state lines. Some customers have locations within Illinois, which would not satisfy the requirements of section 13501. In addition, and as noted previously, the specific quantity is not known, even if the customer is. Some of the product is never sent to the customer at all because it expires.

APL also suggests that because Sedrick was a driver for APL, and because other APL drivers engaged in interstate travel (by, for example, taking the product from the South Beloit facility to foreign states), that Sedrick also could have been asked to engage in such interstate travel, resulting in his being covered by the MCA. APL cites to Supreme Court cases that emphasize that "[i]t is the character of the activities rather than the proportion of either the employee's time or of his activities that determines the actual need for the Commission's power to establish reasonable requirements with respect to qualifications, maximum hours of service, safety of operation and equipment." *Levinson v. Spector Motor Serv.*, 330 U.S. 649, 674–75 (1947). This line of cases is inapposite. The issue in *Levinson* was determining whether a class of employees whose work only sometimes implicated the issues of safety that would justify coverage under 49 U.S.C. § 31502(b) should be regulated by the Secretary of Transportation. The Court answered in the affirmative, because to conclude otherwise would not permit the Secretary to properly regulate these individuals when they were doing work directly related to safety.[5] The Court revisited this issue in *Morris v. McComb*, 332

_____

[5] "[A]n employee who is engaged in a class of work that affects safety of operation is not necessarily engaged during every hour or every day in activities that directly affect safety of operation. While the work of a full-duty driver may affect safety of operation during only that part of the time while he is driving, yet, as a practical matter, it is essential to establish reasonable requirements with respect to his qualifications and activities at all times in order that the safety of operation of his truck may be protected during those particular hours or days when, in the course of his duties as its driver, he does the particular acts that directly affect the safety of its operation."

U.S. 442 (1947), and relied on *Levinson* to conclude that drivers who engage in 4% of interstate commerce and 96% of intrastate commerce can still be regulated by the Secretary. *Id.* at 432–33. The Court reached that conclusion because

> these strictly interstate commerce trips were distributed generally throughout the year and their performance was shared indiscriminately by the drivers and was mingled with the performance of other like driving services rendered by them otherwise than in interstate commerce. These trips were thus a natural, integral and apparently inseparable part of the common carrier service of the petitioner and of his drivers.

*Id.* at 433. Were this court faced with a representative action brought by Sedrick on behalf of all APL drivers, a similar conclusion might be necessary since APL engages in frequent interstate activity. But that is not the issue presented in his case. Sedrick never engaged in interstate activity. Although *Morris v. McComb* sets a very low bar by finding that if 4% of the drivers' routes are interstate, the driver is covered by the MCA, the difference between 4% and 0% is more profound than is the difference between 4% and 100%. In a situation where a driver is engaged in even a slight amount of interstate travel, the Secretary of Transportation is authorized to regulate part of the worker's hours, and the question is how broad the Secretary's authority to regulate reaches. *See* 49 U.S.C. § 13501; *Levinson*, 330 U.S. at 675–76; *see also Morris*, 332 U.S. at 432 n.11 (noting that even "ten minutes of driving by an unqualified driver" can do substantial harm and would need to be regulated). But section 13501 grants the Secretary this broad authority only when the product is being transported as part of an interstate journey. §§ 13501(1)(A)–(B). That is not the issue presented here. Furthermore, if Sedrick were found to be regulated by the MCA, then every intrastate carrier would also be covered since there would always be a chance that a driver might, hypothetically, need to cross a state line at some point. For better or worse, this is not the rule. *See Wagoner Transp. Co.*, 425 F.2d 407 (finding intrastate drivers not covered by MCA).

---

*Levinson*, 330 U.S. at 675–76.

Because the product's final destination was not known when Sedrick moved it from Pecatonica to South Beloit, this movement was not yet part of in an interstate journey, and the provisions of the MCA did not apply. Accordingly, the FLSA exemption for the MCA also did not apply, and Sedrick was entitled to the overtime provisions of the FLSA.

### III. CONCLUSION

Sedrick has established his entitlement to overtime provisions under 29 U.S.C. § 207(a)(1). As requested by the parties, the amount of actual damages will be determined subsequently.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: June 8, 2009